## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
## SOUTHWESTERN DIVISION

| | | |
|---|---|---|
| Stanley L. Schultz, | ) | |
| | ) | |
| Petitioner, | ) | Case No.   1:05-cv-092 |
| vs. | ) | |
| | ) | |
| Timothy Schuetzle, Warden, | ) | **REPORT AND** |
| North Dakota State Penitentiary | ) | **RECOMMENDATION** |
| | ) | |
| Respondent. | ) | |

Petitioner Stanley L. Schultz filed a Writ of Habeas Corpus under 28 U.S.C. § 2254 seeking restoration of his good-time credits along with an attached "Memorandum of Law" supporting his petition.  (Doc. No. 1)  Respondent answered and moved to dismiss the petition. (Doc. Nos. 5-6). Petitioner responded to the motion and Respondent filed a reply.  (Doc. Nos. 8 & 10)   Petitioner then filed a motion for summary judgment to which the Respondent filed a response.   (Doc. Nos. 14-16)

The Honorable Daniel L. Hovland, Chief Judge of the District Court, has referred this matter to the undersigned for preliminary consideration.  For the reasons set forth below, it is recommended that Petitioner's motion for summary judgment be denied, Respondent's motion to dismiss be granted, and Petitioner's habeas petition be dismissed with prejudice.

## I.    BACKGROUND

### A.    Schultz's disciplinary hearings and state-court proceedings

On May 26, 2000, Schultz plead guilty to manslaughter, a Class B Felony, in state district court.  He was sentenced to seven years imprisonment, commencing on May, 26, 2000, in a state corrections facility.  He was ordered to serve five years with the remaining balance suspended for

five years from the date of his release.  On December 13, 2000, he also plead guilty to aggravated assault, a Class C Felony.  He was sentenced to three years imprisonment to run consecutively to his manslaughter sentence.  Under N.D.C.C. § 12.1-32-09.1, Schultz is required to serve at least 85% of his sentence in each case before he is eligible for any form of release, including good-time sentence reduction.

On February 23, 2004, the Adjustment Committee at the North Dakota State Penitentiary ("NDSP") held a disciplinary hearing charging Schultz with trafficking and smuggling contraband into the prison, an A-8 code violation.  (Docket No. 6, Exhibit 3)  The disciplinary hearing was the result of a North Dakota Bureau of Criminal Investigation ("BCI") into reports of contraband being smuggled into the prison. (Id.)

Before the hearing, Schultz was given a list of rights and responsibilities, including his right to remain silent.  He signed both papers acknowledging he received the notices.  He also was given a copy of the incident report ("Incident Report") describing the charges against him.  (Docket No. 6, Exhibit 3)   The Incident Report alleged that an investigation into the smuggling of contraband into the NDSP revealed that Schultz was receiving contraband from a Correctional Officer and that this activity occurred while the officer was on duty.  The Incident Report further alleged that a post office box had been set up by another inmate's visitor where money was sent and was then mailed by this inmate's associate to others to pay off contraband debts.  Finally, the Incident Report stated that the "person running the scam" informed the committee that two money orders were sent to Schultz's mother in Minneapolis, Minnesota.  (Id.)

It does not appear that any witnesses testified at the hearing.  Rather, what was submitted to the Committee along with the Incident Report was a copy of detailed investigation report (eighteen

pages plus attachments) prepared by the BCI ("BCI Report") that implicated a number of inmates and at least one prison guard in a conspiracy to smuggle contraband into the prison, a letter from a confidential prisoner informant, and a short internal investigation report referred to as the "Captain's Report."  (Docket No. 6, Exhibit 3)  The Captain's Report indicated that Schultz denied being involved in the smuggling operation when confronted with the charge that he and his mother were involved.   It also contained the Captain's conclusion that Schultz was guilty and the recommendation that he should be "hit hard" with sanctions.  Schultz was not allowed to see the BCI Report or any of its attachments, which included copies of two money orders and a bank draft and the handwritten letter from the confidential prisoner informant.

Schultz did not make any statements during the hearing before the Adjustment Committee. Following the hearing, the Committee found Schultz guilty of the A-8 code violation based on the Incident Report, the BCI investigation, and the investigation of the "Captain."  The Committee also stated, "We also believe that if Stanley was not involved in the offense he would have made statements of the like during the hearing." The Committee recommended to the warden that Schultz lose all of his good-time and be placed in disciplinary detention for 30 days, that he lose his prison job, that his good-time be stopped until he was re-employed, and that a complaint be forwarded to Burleigh County for possible criminal prosecution.  The recommendations of the Adjustment Committee were accepted on the same day by the acting Warden.  (Docket No. 6, Exhibit 3)

Under NDSP procedures, Schultz had the right to appeal the decision to the Warden within 15 days of his receipt of the written decision to the Adjustment Committee and then to appeal the Warden's decision to the Director of the Corrections Office within 48 hours of the Warden's decision.  On February 25, 2004, Schultz appealed the decision to the Warden.  (Docket No. 6,

Exhibit 4) In his appeal, he denied the charges, including any involvement by his mother. He claimed that there was absolutely no physical evidence presented during the hearing proving that contraband was never found or that trafficking occurred. Also, he argued that the NDSP did not fire the guard for having been involved in the smuggling of contraband; hence, he could not be guilty. The acting Warden rejected Schultz's appeal on February 26, 2004, stating that the NDSP did not need to present any physical evidence, but instead only needed to provide "some evidence" to find him guilty of the offense, and that the BCI Report "clearly establishes Stan's connection to this trafficking ring."   (Id.)   It does not appear that Schultz further appealed to the DOCR Director. (Docket No. 6)

In August 2004, Schultz filed a petition in state district court seeking a Writ of Habeas Corpus. (Docket No. 6, Exhibits 5 & 9A)  In the petition, Schultz alleged his sentence was illegally extended 245 days by the disciplinary committee in violation of the 5th, 6th, and 14th Amendments of the United States Constitution as the result of the taking away of his accumulated good-time.

Before his petition was heard by the state district court, NDSP officials gave Schultz a second disciplinary hearing that was held on September 2, 2004, presumably to address several of Schultz's complaints with respect to the first hearing. This time, prior to the hearing, NDSP officials gave Schultz edited excerpts from the body of the BCI Report along with a redacted typed copy of the hand-written letter from the confidential prisoner informant that was an attachment to the BCI Report. (Docket No. 6, Exhibit 12)  The money orders and bank draft that were attached to the BCI Report were not provided, however, even in a redacted form.  (Docket No. 14, Affidavit of Timothy Schuetzle)

Schultz told the Adjustment Committee he objected to the second hearing because he had a habeas corpus petition pending before the state district court and that it was against case law to provide the missing materials after the original hearing.  (Docket No. 6, Exhibit 12B)

At the second hearing, it appears the same evidence was presented in terms of the Incident Report (a second one was submitted that in substance was the same as the first), the BCI Report, and the attachments to the BCI Report that included the confidential prisoner informant's letter and the two money orders and bank draft.  It appears the "Captain's Report" was also submitted since the box for "Investigation Report" was checked on the Committee's form decision separate from the identification of the BCI Report as part of the evidence considered.  (Docket No. 6, Exhibits 12-14) In addition, unlike the first hearing, the Adjustment Committee considered NDSP records with respect to Schultz's prior history of drug and other contraband usage, including an administrative conviction for smoking marijuana on April 30, 2003.  (Docket No. 6, Exhibit 15)  It does not appear this material was considered the first time.  (Docket No. 6, Exhibit 3)

Schultz did not testify at the second hearing and the Adjustment Committee found Schultz guilty of trafficking and smuggling and took away all of his good-time.   However, no additional sanctions were imposed because Schultz had already served the sanctions that were imposed following the first hearing.  The reasons given by the Committee for finding Schultz guilty the second time are discussed in more detail later herein, but notably did not include any reliance upon Schultz's failure to testify.  (Docket No. 6, Exhibits 12 & 12A)

The recommendation of the Advisory Committee was accepted by the Warden on September 4, 2004.  It does not appear that Schultz appealed the second decision of the Adjustment Committee

5

to the Warden.  The reason for that may have been the fact that his petition for habeas relief was still pending before the state district court.

Subsequently, the state district court concluded that Schultz was not entitled to relief under North Dakota's habeas corpus laws, apparently on the theory that a determination of eligibility for good-time is a matter within the sole discretion of the Department of Corrections and not within the discretion of the courts.  However, the court went on to address several of the federal constitutional issues raised by Schultz, but ultimately concluded there were no violations in light of the second hearing that had been afforded.  The district court's order dismissing Schultz's habeas petition was entered on February 11, 2005.  (Docket No. 6, Exhibit 7)

Schultz next filed a motion to reconsider with the district court, which also was denied. (Docket No. 6, Exhibit 8).  Then, on June 24, 2005, he filed an application for habeas relief with the North Dakota Supreme Court.  (Docket No. 6, Exhibits 9, 9A, 11)  He again alleged his good time credits were unconstitutionally taken in violation of the North Dakota and United States Constitutions.  Specifically, he alleged his right to remain silent was held against him, the redacted BCI investigation report was so vague that it could have been "any number of black inmates at NDSP," the allegations by the confidential informant were not provided to him and were not corroborated, the rules of evidence were improperly applied, and falsified evidence was used against him, namely the money orders.  (Docket No. 6, Exhibit 9)  The North Dakota Supreme Court denied his petition without discussion.  (Docket No. 6, Exhibit No. 11)

**B.**     **Schultz's 28 U.S.C. § 2254 habeas petition**

On August 26, 2005, Schultz filed his petition under 28 U.S.C. § 2254 with this court.  The petition sets forth the following grounds for relief:

#1.   Schultz was denied his due process rights because he was not able to see all of the relevant evidence against him prior to the disciplinary hearing.

#2.   Schultz's due process rights were violated because falsified evidence was used against him during the disciplinary hearing.

#3.   The disciplinary committee used Schultz's silence at the hearing against him in violation of his 5th Amendment right against self incrimination.

3a.   Schultz was denied counsel during the hearing.

#4.   The state district court failed to recognize that a habeas corpus proceeding was the proper action to challenge a loss of good-time credits.

(Doc. No. 1)

In addition, Schultz alleges in his "Memorandum of Law" that the Adjustment Committee improperly relied upon unverified and unreliable confidential-informant information and that there was insufficient evidence to support the conviction. These additional grounds will be considered because the Memorandum of Law accompanied the petition and the same arguments were made in the state habeas proceedings.

## II.   LEGAL DISCUSSION

### A.   Scope of Review

Under 28 U.S.C. § 2254, a federal court may review state-court criminal proceedings to determine whether a person is being held in violation of the United States Constitution or other federal law. This review is limited because, as a matter of federalism and comity, primary responsibility for ensuring compliance with federal law in state-court criminal proceedings rests with the state courts. Consequently, federal-court intervention is limited under § 2254(d) to the instances

in which a person is being held in custody pursuant to a state-court decision that (1) is directly contrary to established federal law as enunciated by the United States Supreme Court, (2) is an objectively unreasonable application of Supreme Court precedent, or (3) is based on an unreasonable determination of the facts based on the evidence presented in the state-court proceeding.   See generally Woodford v. Visciotti, 537 U.S. 19, 26-27 (2002)(per curiam); Williams v. Taylor, 529 U.S. 362, 399-413 (2000); Williams v. Taylor, 529 U.S. 420, 436-437 (2000).[1]

Also, in keeping with the policy of state courts having primary responsibility for enforcement of federal rights in state-court proceedings, § 2254 contains a number of additional rules and procedures for ensuring that state-court convictions are given the maximum effect as allowed by law and to limit federal-court "retrials" of state-court criminal proceedings under the guise of federal habeas corpus.   See   Bell v. Cone, 535 U.S. 685, 693 (2003).   For example, under § 2254(b), a federal court may only consider claims that have been first presented to the state court for consideration.[2]   Further, it is not enough just to first present the federal claims to the state court.   The

---

[1]   The Supreme Court has held that the "contrary to" and "unreasonable application" clauses of § 2254(d)(1) have independent meaning and has described the differences as follows:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. Id., at 405-406, 120 S.Ct. 1495. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. Id., at 407-408, 120 S.Ct. 1495. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams that an unreasonable application is different from an incorrect one. Id., at 409- 410, 120 S.Ct. 1495. See also id., at 411, 120 S.Ct. 1495 (a federal habeas court may not issue a writ under the unreasonable application clause "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly").

Bell v. Cone, 535 U.S. at 694; see also Early v. Packer, 537 U.S. 3, 7-11 (2002) (per curiam) (distinguishing between the application of the "contrary to" and "unreasonable application" clauses).

[2]   Proper presentation requires that the petitioner refer to the particular federal constitutional right or cite to a state or federal case that raises the pertinent constitutional issue.   Cox v. Burger, 398 F.3d 1025, 1031 (8th Cir. 2005).

federal claims must also be exhausted in state court using available state-law procedures before there can be federal-court consideration of the claims. And, in most cases, claims that have been procedurally defaulted at the state level are not reviewable in federal court. E.g., Clemons v. Luebbers, 381 F.3d 744, 750 (8th Cir. 2004).

Petitioners are also required in most cases to develop the factual bases for their federal claims in the state-court proceedings. Federal evidentiary hearings will not be available to develop the necessary facts unless petitioners can show that the claims rely upon a new, retroactive law or that petitioners could not have previously discovered the facts required to support their claims by the exercise of due diligence. 28 U.S.C. § 2254(e)(2). Finally, state-court factual findings carry a presumption of correctness that can only be rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

While the foregoing provisions of § 2254 are most often applied to habeas proceedings that challenge the validity of state-court convictions, the provisions also apply to challenges on federal constitutional grounds to present or future confinement of a state prisoner resulting from the denial of good time credit. See e.g., Gomez v. Graves, 323 F.3d 610, 612-613 (8th Cir. 2003).

**B.    Schultz's constitutional objections should be considered in the context of the second disciplinary hearing**

In this case, NDSP officials provided Schultz with a second disciplinary hearing, presumably to eliminate several arguments of error that Schultz claimed in his state-court habeas proceedings with respect to the first hearing. Schultz claims that the second hearing was a sham and was based upon fabricated evidence.

However, after reviewing the evidence considered by the Adjustment Committee, there is no indication that any evidence was fabricated or that the second hearing was a sham. In fact, the Adjustment Committee issued a new written decision that gave reasons for its finding of guilt and indicated what evidence it relied upon, including Schultz's record of drug and other contraband usage that was considered during the first hearing.

Consequently, Schultz's allegations of constitutional violation should be examined in the context of the second hearing keeping in mind that the relief being sought in this proceeding is habeas relief. Harper v. Lee, 938 F.2d 104, 105 (8th Cir. 1991) (per curiam); see also, Wycoff v. Nichols, 94 F.3d 1187 (8th Cir. 1996) (any due process violation resulting from prison disciplinary committee's initial decision to sanction an inmate was cured by State Department of Corrections' remand of inmate's case to disciplinary committee for rehearing and disciplinary committee's subsequent dismissal of inmate's case).

### C.  Due Process Claims

#### 1.  Additional background

Schultz claims that his due process rights have been violated because of evidence that was not disclosed to him. He also challenges the sufficiency of the evidence, including, the use of allegedly unreliable, confidential-informant information.

For reasons discussed in more detail below, the court ordered that the material considered by the Adjustment Committee that was withheld from Schultz, be filed under seal for the court's inspection *in camera*, which inspection has now been completed. In order to properly evaluate Schultz's due process claims, it is necessary first to consider in more detail the evidence that was

disclosed and not disclosed to Schultz, along with the sources of the information relied upon by the

Adjustment Committee.

### a.    Information provided to Schultz

One of the items provided to Schultz before the first and second hearings was the Incident

Report charging him with the A-8 violation of Trafficking/Smuggling Contraband.  Specifically, the

version of the Incident Report provided to Schultz before the second hearing stated the following:

> As a result of an investigation into contraband smuggling into NDSP information
> was received that Stanley Shultz was receiving contraband from a Corrections
> Officer.  This occurred while the officer was on duty in the NDSP's Infirmary.
> Further investigations done by the ND Bureau of Criminal Investigation discovered
> that a post office box had been set up by another inmate's visitor where money was
> sent and then was remailed this inmates associate to others to pay off contraband
> debts.  Information received from the person running this scam that 2 money orders
> were made out and sent to Stanley Shultz's mother in Minneapolis, MN.
> Attached for Mr. Schultz are pertinent, redacted copies of the BCI report and a typed
> copy of a hand-written note from a confidential informant.

(Docket No. 6, Exhibit 12)

Also provided to Schultz prior to the second hearing were redacted portions of the BCI

Report.  The complete BCI Report considered by the Adjustment Committee was eighteen pages in

length and contained fifty-six numbered paragraphs of text along with lists of other information.

In addition, there were a number of attachments to the BCI Report, including a copy of a

handwritten letter from a confidential prisoner informant and several money orders.  Generally

speaking, the BCI Report summarizes an investigation conducted by the BCI with respect to the

smuggling and distribution of contraband at the NDSP and implicates a number of prisoners and one

or more prison guards.

The portions of the body of the BCI Report that were provided to Schultz prior to the second

hearing were the following three redacted paragraphs:

11

12.     Arrangements were then made for S/A [edited] to call the NDSP later in the evening of December 23, 2003 to see if [edited] had indeed made contact with C/O [edited] and if C/O [edited] was agreeable to pick the money up when C/O [edited] shift ended at 9 p.m. After these arrangements were taken care of, S/A [edited] was given a note, written by an inmate and passed on to the captain, in regards to C/O [edited] S/A [edited] was told that it was believed that the writer of the letter was another inmate by the name of [edited].  The note contained information about C/O [edited] bringing in drugs and tobacco and also named some of the inmates who were involved with C/O [edited].  The inmates mentioned were: [edited] S. Schultz, [edited] (last name unknown), [edited], and [edited].  Please see attached letter.

34.     The next inmate brought in was [edited] was shown a copy of the letter with several names written on it. S/A [edited] asked [edited] if [edited] had indeed forwarded that letter containing the inmate's names to the captain. [Edited] stated in the affirmative that [edited] had written the letter.  [Edited] gave several pieces of information in regards to drugs and tobacco inside the walls at the NDSP.  In regards to the information that [edited] had on C/O [edited] stated that in December of 2003, C/O [edited] had cigars containing marijuana for sale, and C/O [edited] also had Pall Mall cigarettes for sale. [Edited] further stated that C/O [edited] also distributed tobacco in the NDSP for C/O [edited] also stated that on one (1) occasion, [edited] observed C/O giving some sort of contraband, unknown to what, to a black inmate, unknown name.  S/A [edited] then asked [edited] if [edited] would write down all the information that [edited] had in regards to contraband coming into the NDSP, who may be bringing it in and who may be receiving it. [Edited] told S/A [edited] and Chief of Security Stromme that [edited] would write a letter with that information and get it to Chief of Security Stromme.

49.     S/A [edited] asked [edited] if [edited] have ever heard the name S. Schultz, who is an inmate at the NDSP. [Edited] told S/A [edited] that at one (1) time, [edited] had been instructed by [edited]  to send Three Hundred Dollars ($300) to S. Schultz's mother in Minneapolis, Minnesota. [Edited] stated that she thought S. Schultz's mother's name was Linda Schultz. [Edited] stated that she purchased the Three Hundred Dollar ($300) money order in September of 2003, in [edited] name at the post office in [edited] and this [illegible] money order sent on to L. Schultz.

(Docket No. 6, Exhibits 13A-C).

Finally, the NDSP officials also provided to Schultz a redacted version of the confidential prisoner-informant's letter, which was an attachment to the BCI Report, that was typed to conceal the informant's identity and provided to Schultz in the following form:

> Approximately December 23, 2003, the NDSP Captain's office received a letter from an inmate informant, identified an officer that was allegedly bringing marijuana into the facility for inmate Stanley Schultz.  Below is a transcript of that handwritten letter, using pseudonyms where applicable to keep the names of the informant and other inmates confidential for safety and security reasons.  The letter is typed to protect the identity of the informant from being disclosed through handwriting analysis.  It is typed exactly as spelled, with the grammatical errors left as written.
>
> Captain-
> John Smith (pseudonym for a Correctional Officer at NDSP) has brought Stan S. 9. oz. of weed and has 6 lb. left to bring.  He bring some 4-6 oz. Every 1 ½ to 2 ½ weeks.  Smith calling him up at evening rec, depending on the traffic guard.  There's 2 oz. of crank to bring in when the time is right.  Since John Doe (pseudonym for an inmate) can't bring in pills anymore, Stan is going to buy it through Smith.  There cans of tobacco coming in 1 can to a rolled zipped lock bag.  They are given from Stan to Jack Doe (pseudonym for an inmate), which is brought to Industry and brought over when money is sent out to purchase it.  There is 16 cans over there-32 rolled bag.
> Dirty U.A. Stan Schultz.  Smith will let Stan know if theres a U.A. slip for him if he's working at night, for the morning.
> U.A. (lists names of 12 additional inmates).

(Docket No. 6, Exhibit 14).

### b.    Information not provided to Schultz

Except for the redacted three paragraphs and the prisoner-informant's letter, the bulk of the eighteen-page BCI Report and its attachments were not provided to Schultz.   Most of the non-disclosed material  focused on the involvement of other prisoners, but, in a general sense, still had some relation to Schultz to the extent it involved a broader conspiracy of which Schultz was a part, even if unknowingly, and to the extent the material may have had a bearing upon the credibility of the confidential-informant information.  Further, there was a some additional material in the BCI

Report and attachments that specifically mentioned Schultz that was not disclosed, even in redacted form.

Of the information in the BCI Report that was not disclosed to Schultz, the most relevant were the copies of the following attachments:  a postal money order in the amount of $120, a bank draft labeled as a "personal money order" in the amount of $55, and a third bank draft in the amount of $100.  The two "money orders" were referenced by the Adjustment Committee in its decision as being items of corroborating evidence of Schultz's specific involvement.  However, as discussed in more detail below, the money orders were corroborating evidence, but did not directly evidence Schultz's involvement as the Adjustment Committee believed.

Also, not disclosed to Schultz, even in redacted form, were at least four other paragraphs of the BCI Report that specifically mentioned Schultz, nos. 1, 18, 20, & 29.  Paragraph 1 contains preliminary information from an unnamed confidential prisoner-informant identifying Schultz as one of several prisoners involved in the smuggling of contraband into the NDSP, without providing any other detailed information as to Schultz.  It is not clear whether this prisoner-informant is the same "John Doe" informant who later provided the letter to NDSP officials that was disclosed to Schultz in redacted form.  Paragraphs 18 & 20, along with a related attachment, do not mention smuggling or contraband, but do contain information that might be considered circumstantial evidence of Schultz's involvement.  Paragraph 29 discusses an interview with Schultz during which he denied involvement in any smuggling operation.

### c.  Confidential source information

Essentially, the primary evidence against Schultz came from two sources that are referred to herein as the "John Doe" and "Jane Doe" informants.  These informants were confidential in the

sense that their identities were not disclosed to Schultz, but they were identified by name in the BCI Report, so the Adjustment Committee was aware of who they were. It appears that the only "confidential" informant whose identify was not made known in the BCI Report nor disclosed to the Adjustment Committee was the informant who provided the information in paragraph number 1 of the BCI Report. However, as discussed later herein, the information provided by this informant was very general and preliminary, and it is not clear what consideration the Adjustment Committee gave to this evidence.

"John Doe" was the prisoner-informant who provided the information set forth in paragraphs 12 & 34 of the BCI report, which were disclosed to Schultz in redacted form. He is also the author of the letter describing the drug smuggling at the NDSP, which was provided to Schultz in redacted form. The essence of the information provided by "John Doe" was that drugs and tobacco were being smuggled into the NDSP by a prison guard for further distribution to prison inmates and that Schultz was one of several prisoners involved in the smuggling/distribution operation with the prison guard. In his letter, John Doe provided some information as to the type of drugs involved, drug quantities, the methods of distribution, and names of a number of prisoners involved.

"Jane Doe" was the female associate of another inmate who was involved in the smuggling operation from outside the NDSP. She provided the information set forth in paragraph 49 of the BCI report and also some of the information that formed the basis for the factual allegations set forth in the Incident Report. Among other things, she told investigators that she set up a  post office box in her name in Strasburg, North Dakota, to receive money for payments of contraband smuggled into the NDSP and that she then forwarded this money to others. The only information that she provided

15

with respect to Schultz, was that, on one occasion, she sent a money order in the amount of $300 in her name from Strasburg, North Dakota to Schultz's mother in Minneapolis, Minnesota.

### 2.    Due Process Requirements

"[A] prisoner is not wholly stripped of constitutional protections when he is imprisoned . . . ." Wolff v. McDonnell, 418 U.S. 539, 555 (1974).  In particular, among the rights that a prisoner retains is the right to "Due Process" under the Fourteenth Amendment.

When a violation of due process is claimed, the first inquiry a court must make is whether the prisoner has a life, liberty, or property interest that is protected by the Due Process Clause.  See Wilkinson v. Austin, __ U.S. __, 125 S.Ct. 2384 (2005); Sandin v. Conner, 515 U.S. 472, 477-487 (1995).   In this case, Schultz claims a liberty interest in accumulated good-time credits that may impact on the length of his incarceration, relying upon Wolff, 418 U.S. at 556-558 (1974) (liberty interest in avoiding deprivation of good-time credits created by state policies).   Given North Dakota's statutory scheme for earning good-time credits, which is codified at N.D.C.C. ch.12-54.1, there appears to be little doubt that Schultz has such a liberty interest.  See id.; Wilkinson v. Austin, 125 S.Ct. at 2393-97; Louis v. Department of Correctional Services of Nebraska, __ F.3d __ (8th Cir. 2006); Jensen v. Satran, 332 N.W.2d 222, 226-227 (N.D. 1981) (construing prior statutes).

The next inquiry the court must make is to determine what process Schultz was due.  As to this issue, the "fact that prisoners retain rights under the Due Process Clause in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed."  Wolff, 418 U.S. at 556.  "Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does

16

not apply." Id. "In sum, there must be mutual accommodation between institutional needs and objectives and the provision of the Constitution that are of general application." Id.

In the context of disciplinary hearings involving the deprivation of good-time credits, governing case law, beginning with the seminal case of Wolff v. McDonnell, strikes the balance between an inmate's due process rights and the institutional needs and objective by requiring that an inmate be provided (1) "advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his [or her] defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action." Espinoza v. Peterson, 283 F.3d 949, 952 (8th Cir. 2002); see also, Hrbek v. Nix, 12 F.3d 777, 780 (8th Cir.1993) (citing Wolff, 418 U.S. at 563-67).

In addition to these procedural protections, governing case law also requires that there must be "some evidence" to support a deprivation of the good-time credits - at least when the decision denying good-time credits is otherwise subject to court review. Superintendent v. Hill, 472 U.S. 445 (1985). And, in this case, the Respondent has not claimed this court lacks the power to review Schultz's federal constitutional claims.[3]

---

[3] The Respondent did argue to the state district court that the award of good-time credits was within the complete discretion of NDSP officials and not subject to court review. Although it appears that the state district court agreed relying upon precedent that was not particularly on point, the state district court nonetheless proceeded to consider Schultz's constitutional objections, including making reference to the "some evidence" standard of review. Thereafter, when Schultz filed for state habeas relief with the North Dakota Supreme Court, the Respondent appears to have abandoned the argument that the denial of good-time credits is not subject to court review. Instead, the Respondent argued that the state habeas statutes were not the appropriate vehicle for providing relief and, in the alternative, that Schultz's federal constitutional objections were without merit. As previously noted, the North Dakota Supreme Court denied Schultz's petition without comment.

Also, creating further confusion with respect to the state-court proceedings (including the district court's conclusion that the denial of the good-time credits is not subject to court review) is the fact that Schultz sought relief under the state habeas statutes even though the North Dakota Supreme Court had previously ruled (albeit under an older statutory regime) that a challenge to a deprivation of good-time credits can be brought by an application for post-conviction relief under N.D.C.C. ch. 29-32 [which has since been repealed and replaced by ch. 29-32.1] and not by a

### 3.      Adequacy of Respondent's disclosures

As noted, one of the due process requirements established by <u>Wolff</u> is the right to advance written notice of the disciplinary charges.  <u>Wolff</u> and its progeny have made clear that this notice must be something more than a conclusory allegation of an administrative violation; rather, some notice of the factual bases underlying the accusation must be given.  <u>See</u>, <u>e.g.</u>, <u>Wolff</u>, 418 U.S. at 564; <u>Sira v. Morton</u>, 380 F.3d 57, 70-72 (2nd Cir. 2004);  <u>Freitas v. Augur</u>, 837 F.2d 806, 809 (8th Cir. 1988).  Recently, the Supreme Court in <u>Wilkinson v. Austin</u> emphasized, "For more than a century the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they enjoy that right they must first be notified.'"125 S.Ct. at 2396 (<u>quoting</u> <u>Fuentes v. Shevin</u>, 407 U.S. 67, 80 (1972)).

On the other hand, due process in this context does not require that all of the evidence against the prisoner be disclosed prior to the hearing.  Rather, the ultimate test of the adequacy of the pre-hearing disclosure is whether it provides the prisoner with a meaningful opportunity to marshal the facts and prepare a defense.  <u>See</u>, <u>e.g.</u>, <u>Wolff</u>, 418 U.S. at 559-564;  <u>Sira v. Morton</u>, 380 F.3d at 72; <u>Freitas v. Augur</u>, 837 F.2d at 809.

---

petition for habeas relief under ch. 32-22.  <u>Matz v. Satran</u>, 313 N.W.2d 740, 741 n.1 (1981); <u>see</u> <u>also</u> <u>Shulze v. Satran</u>, 368 N.W.2d 531 (N.D. 1985) (substantively reviewing a denial of good-time credits in a proceeding initiated under ch. 29-32).

Given the foregoing, and the fact the Respondent is not arguing that this court may not review the denial of good-time credits on federal constitutional grounds (including substantive review under the "some evidence" standard), no deference is given to the decision of the state district court's holding that court review is not permitted.

Finally, while on the subject of the state-court proceedings, the Respondent does not argue in this case, and wisely so, that Schultz did not exhaust his state-court remedies or that he procedurally defaulted his state-court claims. In several prior state-court cases, it appears that the North Dakota Supreme Court would simply remand a case to the state district court for further proceedings that was brought under the habeas chapter when it should have been brought under the chapter providing for post-conviction relief.  <u>Matz v. Satran</u>, 313 N.W.2d 741 n.1.  However, in this case, the state district court has already considered Schultz's federal constitutional objections and these objections  were reargued to the North Dakota Supreme Court.  When the North Dakota Supreme Court denied Schultz's petition without comment, it is impossible to determine whether it was because the wrong process had been followed or because the supreme court believed Schultz's claims lacked merit.

In this case, the process afforded Schultz was a hearing before the Adjustment Committee followed by the opportunity for two administrative appeals, first to the Warden and then to DOCR Director. However, since there is nothing that guaranteed Schultz the right to supplement the record as part of the administrative appeals (although he may have been allowed to do so as a practical matter), the adequacy of the advance notice must be determined based upon what was submitted to Schultz prior to the hearing before the Adjustment Committee. Sira v. Morton, 380 F.3d at 72 (curative disclosures at the time of the hearing are insufficient unless the inmate is afforded a meaningful opportunity to respond); see Wolff, 418 U.S. at 564 (rejecting generally the practice of giving notice of the charges at the hearing and requiring at least 24-hours advance written notice).

Prior to the second hearing, NDSP officials provided Schultz with a new Incident Report that provided some of the factual allegations supporting the charge. Further, Schultz was furnished with redacted copies of the most pertinent paragraphs from the BCI Report along with a redacted copy of the "John Doe" confidential informant letter. Collectively, this material spelled out in some detail what Schultz's alleged role and involvement was in the drug smuggling, including details as to the particular drugs involved, the mechanics of the smuggling operation (*i.e.*, the use of a prison guard to bring in and distribute the drugs, the assistance of the "Jane Doe" informant to handle the payments, the use of money orders as means of payment, the sending of money-order payments to Schultz's mother, etc.), and the status of the persons providing the information (*i.e.*, whether the persons were prisoners, outside informants, law enforcement officers, etc.) even though the identities of the persons were not disclosed. Among other things, this gave Schultz the opportunity to provide a detailed denial (which he chose not to do), provide a denial by his mother (which he either chose not to do or was unable to provide), and marshal other exculpatory evidence (if any). In summary,

19

Schultz was given sufficient information regarding the factual bases for the charge to allow him to marshal the facts and prepare a defense.

The other disclosure obligation required by <u>Wolff</u> is the right to a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.  In this case, the written statement provided by the Adjustment Committee was rather perfunctory and stated in part the following:

> The Committee reviewed the evidence: BCI Report, Money Orders and Confidential Statement of Confidential Informant.  The Confidential Informant is credible and reliable and corroborates the evidence: money orders that show inmate Schultz was involved in trafficking & smuggling of contraband into the North Dakota State Penitentiary.  The Committee also found that inmate Schultz was found guilty of intoxicants (tested positive for marijuana) on 4-30-2003 A-10 Report.  Mr. Schultz has a history of drug usage & is guilty of this A-8 Report for trafficking/smuggling contraband into NDSP.

Also, there were checkmarks in boxes on the form used to report the decision indicating that the Committee's findings were based on the: Incident Report, Physical Evidence, Inmate's Testimony, Confidential Information, and Investigation Report.  Next to the box marked "Physical Evidence" were written the words "BCI Report & Money Orders" and below these words was written "Page 7 & 8."  What was meant by these comments is not clear since it appears that the Committee relied upon more than pages 7 & 8 of the BCI report in that several of the most pertinent paragraphs, which were provided to Schultz in redacted form, came from other pages. Finally, next to the box marked "Confidential Information" is the word "Reliable."

Before considering the adequacy of the Adjustment Committee's written statement, it should be noted that the Committee clearly made a mistake in its written decision with respect to the significance it placed upon the money orders that were attached to the BCI Report, which were not disclosed to Schultz even in redacted form.  The Incident Report charged: "Information received

20

from the person running this scam that 2 money orders were made out and sent to Stanley Schultz's mother in Minneapolis, MN."   In its written decision, the Adjustment Committee stated that corroborating evidence included "money orders [plural] that show that Inmate Schultz was involved in the trafficking & smuggling of contraband" and also made a notation of "money orders" [again plural] as part of the evidence relied upon.

Obviously, the Adjustment Committee believed that the two money orders attached to the BCI Report were sent by the "Jane Doe" informant to Schultz's mother.   However, as the Respondent now concedes, this was not the case.   The two documents that are labeled "money orders" attached to the BCI Report (in the amounts of $55 and $120) were sent to the "Jane Doe" informant (not by her to Schultz's mother) and involved payments for contraband by other prisoners. The only evidence of money being sent to Schultz's mother came from the summary of the interview of "Jane Doe" referenced in the BCI Report (paragraph 49, at page 11) to the effect that she sent one money order to Schultz's mother in the amount of $300.

The Eighth Circuit has taken the position that the "written-statement requirement" set forth in Wolff does not require detailed findings that set forth all of the evidence relied upon, but rather can be satisfied by making reference to the source of the evidence, such as a witness statement or an investigation report.   Brown v. Frey, 807 F.2d 1407, 1410-1414 (8th Cir. 1986) (rejecting contrary authority from several other circuits); see Jensen v. Satran, 688 F.2d 76, 78 (8th Cir. 1982). Consequently, there is no issue with respect to the brevity of the Adjustment Committee's written statement since it does make reference to the evidence relied upon.

However, there remains the requirement that the prisoner is entitled to know the evidence upon which the factfinder relies.  Baxter v. Palmigiano, 425 U.S. 322-323 & n. 5 (1976); Wolff, 418

U.S. at 564-565;  Sira v. Morton, 380 F.3d 57, 74-77 (2ⁿᵈ Cir. 2004); see Espinoza v. Peterson, 283 F.3d at 952.[4]  But, this right is not absolute.  Case law applying the Wolff  requirements recognizes that evidence need not be disclosed when there is a reasonable justification for not doing so, most commonly when disclosure would create a risk of violence or retaliation against inmates or staff. Sira v. Morton, 380 F.3d at 72; Freitas v. Augur, 837 F.2d at 809; see Ponte v. Real, 471 U.S. 491 498-499 (1971).

In this case, the Adjustment Committee clearly did not provide or otherwise make known to Schultz all of the information upon which it relied.   In its written decision, the Committee stated that "the names on these documents were redacted to protect their identities and to protect/prevent any retaliatory action against any staff or inmates involved in the investigation by Schultz."

Upon reviewing *in camera* the complete, un-redacted BCI Report, the Adjustment Committee was clearly justified in redacting the names of the prisoners and the inmates in the portions of the BCI Report and the "John Doe" letter that were provided to Schultz on safety and security grounds.  Likewise, this also was true for the identity of the outside "Jane Doe" informant, particularly since there was specific information that retaliation against witnesses was a real possibility.  (Docket No. 20, paragraph nos. 20, 41, and 48 of the sealed BCI Report)  Further, in addition to the safety and security concerns, it is also apparent from the BCI Report that the NDSP had a legitimate interest in protecting the confidentiality of the broader investigation into the smuggling of drugs and other contraband that involved a number of other inmates and possibly several prison guards.

---

[4]  Brown v. Frey, supra is not inapposite because the evidence that was incorporated by reference in the written decision in Brown was disclosed to the prisoner at the hearing.

However, the Committee went beyond merely deleting the identities of those persons providing information, *i.e.*, it did not disclose, even in redacted form, the money orders, at least four other paragraphs of the BCI report that specifically mention Schultz, and the other parts of the BCI Report that may also have had some circumstantial relevance. Consequently, each of these items will be addressed.

With respect to the "money orders," the Adjustment Committee <u>did</u> disclose in its written decision the existence of the money orders and the fact that it relied upon them in concluding that Schultz had committed the administrative violation. Upon examination *in camera* of the un-redacted copies, the money orders do contain names and other information that could have lead to the discovery of the recipients and, at least for one of the money orders, the discovery of the sender. Consequently, the Committee had a legitimate reasons for not-disclosing the actual documents based on security and safety concerns and also its interest in protecting the confidentiality of the broader investigation.

While in hindsight it may have been better if the two money orders had been disclosed with the names and other information redacted (as the Respondent eventually did in the proceedings before this court), to conclude that the failure to do so would amount to a due process violation would be parsing matters too fine and unduly second-guessing the judgment of the NDSP officials with respect to these difficult matters. <u>See</u> <u>e.g.</u>, <u>Sira v. Morton</u>, 380 F.3d at 75. In this case, the fact that the subject matter of the money orders was disclosed in the written decision as being one of the items of evidence relied upon satisfies due process in this context, particularly since a prisoner can seek to have the material reviewed *in camera* by the court. <u>See</u> <u>e.g.</u>, <u>Ponte v. Real</u>, 471 U.S. at 498-499; <u>Sira v. Morton</u>, 380 F.3d at 75; <u>Espinoza v. Peterson</u>, 283 F.3d at 952.

As it turned out, the Committee was mistaken with respect the significance it attached to the money orders, but the constitutional concerns here are ones of adequate notice and disclosure.  There is no constitutional right to "error-free decision-making."  Ricker v. Leapley, 25 F.3d 1406, 1410 (8th Cir. 1994).

With respect to the four paragraphs in the BCI Report  that specifically mention Schultz and that were not provided, even in redacted form, paragraph number 29 discussed an interview with Schultz during which he denied involvement in any smuggling operation.  The lack of disclosure of this item was of no consequence because Schultz would have been aware of the information. Further, it obviously was not relied upon by the Committee since it found him guilty.

With respect to the other three paragraphs, the *in camera* inspection reveals that the Adjustment Committee probably did not give this information much weight given the more specific information that it had before it from the "John Doe" and "Jane Doe" informants, which was disclosed to Schultz, albeit in redacted form.  In any event, after review of these other paragraphs, the substance of the information that was withheld was made known to Schultz in the Committee's decision (primarily by reference to the Incident Report) and the Committee had reasonable justification for withholding the details on security and safety grounds and also to preserve the confidentiality of the broader investigation.  Further, none of the information was exculpatory. Consequently, for the reasons already stated, there was no violation of Wolff's disclosure requirements.

Paragraph 1 contained preliminary information from an unnamed a confidential prisoner-informant identifying Schultz as one of several prisoners involved in the smuggling of contraband into the NDSP, without providing specific information as to Schultz, and mentioned the involvement

24

of a person on the outside.  The substance of the information contained in paragraph 1 was disclosed to Schultz as part of the factual allegations set forth in the Incident Report, which the Committee indicated in its decision was being relied upon.  Paragraphs 18 and 20, along with a related attachment, did not deal directly with the smuggling of contraband, but did contain information that might be considered circumstantially relevant, particularly with respect to the "dirty" prison guard. The fact that Schultz was involved with a prison guard was generally disclosed to Schultz in the factual allegations set forth in the Incident Report.

As for the remainder of the BCI Report that does not specifically mention Shultz and that was not disclosed, the Committee was also justified in not disclosing this information.  While this material might have some tangential relevance to Schultz to the extent it provided information with respect to the broader conspiracy and information that supported the credibility of the Jane Doe informant, the interest of the NDSP in not disclosing the details of this information on safety and security grounds and to protect the confidentiality of the broader investigation was very high and, under the circumstances, clearly outweighed Schultz's interests, particularly given that this remaining information was not exculpatory, the fact that the general outline of this evidence in terms of the existence of a broader conspiracy involving other prisoners and at least one prison guard was disclosed to Schultz, and the fact that most specific information in the BCI Report relating to Schultz's involvement was disclosed, albeit in redacted form.

In summary, the most relevant parts of the BCI Report, including the "John Doe" letter, were provided to Schultz in redacted form.  These disclosures were sufficient to enable Shultz to marshal the facts and prepare a defense.  Further, the combination of the Adjustment Committee's written decision, the Incident Report, and the other disclosed information sufficiently informed Schultz of

25

the evidence used against him, at least in general terms, and with enough specificity that he was able to point out in these proceedings his concerns about the non-disclosed evidence and obtain an *in camera* review.  Given this was not a criminal proceeding and that Schultz's due process rights have to balanced against the legitimate needs and interests of the NDSP, it must be concluded that the disclosures made to Schultz satisfied Wolff's due process requirements and that there was no violation of due process.  See e.g., Espinoza v. Peterson, 283 F.3d at 952-953.

Finally, even if Wolff's disclosure requirements were violated, it is also clear beyond a reasonable doubt after review *in camera* of the non-disclosed information there is nothing in the material that, if it had it been disclosed, would likely have resulted in Schultz being able to convince the Adjustment Committee he was not guilty.  Hence, any constitutional violation of Wolff's disclosure requirements would have been harmless.  See e.g., Piggie v. Cotton, 344 F.3d 674, 678-680 (7th Cir. 2003); Elkin v. Fauver, 969 F.2d 48, 53 (3rd Cir. 1992); Powell v. Reed, 953 F.2d 744, 749-751 (2nd Cir. 1991).

### 4.    Sufficiency of evidence/reliability of confidential information

Schultz also claims that the disciplinary committee improperly relied upon unreliable information from confidential informants and that otherwise there was insufficient evidence to support the finding of an administrative violation.

The fact that an inmate's good-time credits cannot be taken away arbitrarily and due process requires at least "some evidence" to support the denial has already been mentioned.   In Superintendent v. Hill, the Supreme Court made clear that the "some evidence" standard of review is very limited and stated the following:

> We hold that the requirements of due process are satisfied if some evidence supports
> the decision by the prison disciplinary board to revoke good time credits. This

standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." *United States ex rel. Vajtauer v. Commissioner of Immigration*, 273 U.S., at 106, 47 S.Ct., at 304. Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board. See *ibid.*; *United States ex rel. Tisi v. Tod*, 264 U.S. 131, 133-134, 44 S.Ct. 260, 260-261, 68 L.Ed. 590 (1924); *Willis v. Ciccone*, 506 F.2d 1011, 1018 (CA8 1974). We decline to adopt a more stringent evidentiary standard as a constitutional requirement. Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. See *Wolff*, 418 U.S., at 562-563, 567-569, 94 S.Ct., at 2977-2978, 2980-2981. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

472 U.S. at 455-456.

But, even though review is limited and should not involve an independent assessment of the credibility of the witnesses, governing case law requires that, when the "some evidence" includes confidential-informant information, a determination as to its reliability be made to "ensure that some evidence supports the disciplinary finding and to preclude arbitrary deprivations of an inmate's liberty." Turner v. Caspari, 38 F.3d 388, 393 (8th Cir. 1994) (citing Freitas v. Auger, 837 F.2d 806, 810 (8th Cir. 1988)).  However, the review of the confidential-informant information for reliability is unnecessary when the other evidence in the case considered separately satisfies the "some evidence" standard of review.  Espinoza v. Peterson, 283 F.3d at 952 ("When there is other evidence supporting the disciplinary decision, due process is satisfied 'without determining the reliability of the confidential informant' or the institutional reasons for non-disclosure.")  (quoting Turner v. Caspari, 38 F.3d 388, 393 (8th Cir. 1994).

In this case, the primary evidence that implicated Shultz came from the "John Doe" and the "Jane Doe" informants.  In its written decision, the Disciplinary Committee pointed to the money

orders, the fact that Schultz tested positive for marijuana on 4-30-2003, and the fact that Shultz has a history of drug usage as corroborating information. However, this other evidence standing alone is not "some evidence" of Schultz's guilt of trafficking and smuggling contraband. Hence, it is necessary to consider the reliability of the confidential-informant information.

The reliability of confidential-informant information can be established in a number of ways, including reliance upon the "totality of the circumstances" similar to evaluating sufficiency of the evidence to support an arrest or search warrant. Sira v. Morton, 380 F.3d at 76-81; Freitas v. Augur, 837 F.2d at 810-812. Further, the determination of reliability should give some consideration to the circumstances. For example, an informant who is deemed generally reliable may, in a particular situation, be passing on information that is based upon multiple layers of hearsay, and not first-hand observations, and that is not reliable. Sira v. Morton, 380 F.3d at 76-81

In this case, the Adjustment Committee in its written decision stated it found the "confidential informant" to be credible and reliable. However, no further explanation is given for this cursory conclusion other than to point to the previously mentioned corroborating evidence that by itself is not "some evidence" of Schultz's guilt. Further, the Committee referenced only one confidential informant when, in fact, there was both the John Doe and Jane Doe informants and possibly a third. Finally, the Adjustment Committee obviously misconstrued the significance of the money orders as previously discussed. For these reasons, the determination of the Adjustment Committee is not entitled to any weight, and it was for this reason (coupled with the volume of the information that was generally referred to but not specifically disclosed to Schultz), that the court required the Respondent to submit the non-disclosed evidence relied upon by the Adjustment Committee for *in camera* consideration along with the other evidence.

The information from informant "John Doe" came to the Adjustment Committee via the BCI Report. He did not appear personally so there was no opportunity for the Committee to test his credibility and reliability by asking questions and observing his demeanor. Further, there is nothing in the BCI Report, or in any of the other evidence before the Committee, that indicates whether "John Doe" had a prior track record for providing reliable information. Finally, and perhaps most importantly, the BCI Report does not indicate how "John Doe" came to know the information that he presented, *i.e.*, whether he had first-hand knowledge of the information or whether he was merely repeating jailhouse rumor. The only indicia of reliability was the specificity of the information provided that suggests it may have been based on more than rumor. Under these circumstances, it is questionable whether the "John Doe" information by itself would constitute "some evidence."

The State in its brief states that "John Doe" was known to the Committee members and that they were able to make some judgment as to his credibility. That may be, but there is nothing in the record that supports this.

The information from the "Jane Doe" informant also came to the Committee through the BCI Report. The only information that she provided specific to Shultz was that she was instructed to send a money order in the amount of $300 to Schultz's mother. While the BCI Report does not indicate specifically what this money was for or from whom "Jane Doe" received her instructions, the clear indication from the other information that "Jane Doe" provided was that it was for payment for contraband, since that was what the money orders were being used for.

"Jane Doe" also did not appear before the Adjustment Committee. Further, as with "John Doe," there was no indication as to whether "Jane Doe" had a prior track record for providing reliable information as to other matters. However, unlike "John Doe," she provided a great deal of

29

information about her personal involvement and the involvement of others in the broader conspiracy that was obviously based on first-hand information.  Further, there were a number of documents, which she either had in her possession or which investigators were able to track down, that corroborated the information she provided.  This included the two money orders attached to the BCI Report  that were addressed to the post office box she controlled and that supported her statements that payments for smuggled contraband were sometimes made to her by money orders and that, upon receiving the money, she would then forward it to others.  While none of these documents directly implicated Schultz, the documents do support the conclusion that "Jane Doe" was both credible and reliable.  Also, the information that "Jane Doe" provided was in sufficient detail as to her personal involvement and knowledge to expose her to criminal conspiracy charges.  The fact that she provided information against her penal interest is another indication of its reliability.

Overall, the information available to the Adjustment Committee indicates that the information that "Jane Doe" provided was highly reliable.  But, given the sparsity of the information provided by "Jane Doe" specific to Schultz, it would be a close question whether this information alone would be enough to constitute "some evidence."

However, when the "John Doe" and "Jane Doe" evidence is considered together along with the other evidence, the "some evidence" standard for review is easily satisfied.  In fact, when the evidence is considered cumulatively, the following supports the conclusion that the evidence against Schultz was substantial:

1.    The information provided by "John Doe" clearly implicates Schultz. While this information only has some indicia of reliability based upon its detail, its reliability

is substantially enhanced by the corroborating information supplied by "Jane Doe" that is independent of that provided by "John Doe."

2.    The information provided by "Jane Doe" that appears to be highly reliable for the reasons indicated, including the two money orders that support her statements that money orders were being used by her to receive and send money.   While the information provided specific to Schultz was sparse, the fact that Schultz's involvement was independently confirmed by "John Doe" strongly supports the conclusion she was not mistaken about the money order to Schultz's mother or that the payment was made for some innocent purpose.

3.    The fact that Schultz was caught using marijuana in the time frame relevant to the broader investigation.  While alone not sufficient to support the charge of smuggling, the illicit material came from some place and together with the other evidence is corroborative of his involvement.

### 5.    Allegations of fabricated evidence

Schultz asserts that the Respondent has relied upon falsified evidence, namely the money orders.  He claims they never existed, probably because they were never produced to him.

However, after reviewing *in camera* the material submitted to the court, there were money orders attached to the original BCI Report and there is nothing to indicate that these documents were falsified after the initial disciplinary hearing.   Schultz's unsupported, bald assertions are not sufficient to create a fact issue that warrants a hearing with respect to this allegation.

### C.    Fifth Amendment claim

Schultz claims the committee inappropriately used his silence at the hearing against him. After the first hearing, the committee stated, "We also believe that if Stanley was not involved in the offense he would have made statements of the like during the hearing." (Docket No. 6, Exhibit 3). Schultz's silence was not mentioned as a factor in the findings of the second disciplinary hearing. (Docket No. 6, Exhibit 12A).

As previously noted, the focus should be on the second disciplinary proceeding to determine if it comports with the Due Process Clause. Since Schultz's silence was not used as factor in the findings of the second disciplinary hearing, Schultz's Fifth Amendment claim is moot.

**D.     Sixth Amendment claim**

Schultz argues that he asked for an attorney during the disciplinary proceedings so he could receive advice, but that his request was denied in violation of his constitutional rights.

In Wolff v. McDonnell, the Supreme Court stated:

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held. At this stage of the development of these procedures we are not prepared to hold that inmates have a right to either retained or appointed counsel in disciplinary proceedings.

418 U.S. at 570; see also  Baxter v. Palmigiano, 425 U.S. at 316;  Espinoza v. Peterson, 283 F.3d 949 (citing Baxter as holding there is no right to counsel at prison disciplinary hearings). The only exception, however, is if an inmate is illiterate.  See  Wolff, 418 U.S. at 570.

In this case, Schultz does not claim to be illiterate and has submitted several briefs and motions that contain lengthy arguments to this court. Hence, there was no Sixth Amendment violation in this case.

### E.      State law claim

Schultz claims the state district court improperly concluded that a habeas corpus petition was not the proper procedure for restoring good-time credits from a disciplinary proceeding. However, "'[i]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.'" <u>Brown v. Luebbers</u>, 371 F.3d 458, 466 (8th Cir. 2004) (quoting <u>Estelle v. McGuire</u>, 502 U.S. 62 (1991)).  A federal court reviewing a habeas petition is only concerned with the issues raised under the United States Constitution.  <u>Id.</u>  Consequently, this is not a claim that can be considered by this court.

## III.   <u>CONCLUSION</u>

Based on the foregoing, it is **HEREBY RECOMMENDED** that Schultz's motion for summary judgment (Docket No. 14) be denied, Respondent's Motion to Dismiss be granted, and Schultz's Petition under 28 U.S.C. § 2254 for a Writ of Habeas Corpus by a Person in State Custody (Docket No. 1) be dismissed with prejudice.

### <u>NOTICE OF RIGHT TO FILE OBJECTIONS</u>

Pursuant to Local Rule 72.1(3)(4), any party may object to this recommendation within ten (10) days after being served with a copy of this Report and Recommendation. Failure to file appropriate objections may result in the recommended action being taken.

Dated this 16th day of March, 2006.


/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge

33